UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| **FANNIE GARCIA** | § | |
| **PLAINTIFF** | § | |
| | § | |
| **V.** | § | **CAUSE NO. 5:10-cv-00030** |
| | § | |
| **CITY OF LAREDO, ET AL.** | § | |
| **DEFENDANTS** | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, City of Laredo, Texas, Carlos Maldonado, Cynthia Collazo, Gilbert Navarro, Gilbert Magaña, and Steven Moncivais, and in response to Fannie Garcia's Motion for Summary Judgment would show as follows:

1.    The Plaintiff, Fannie Garcia ("Garcia") moved for summary judgment on the following allegations: " the Defendants . . . nonetheless accessed viewed downloaded preserved and disseminated this highly embarrassing private content to persons to whom these were not intended. Garcia alleges that Defendants' singular and collective actions in doing so violate The Federal Stored Communications Act, 18 U.S.C. §§ 2701-2712 [which incorporates The Wiretap Act 18 U.S.C. § 2501 Seq.], the Fourth and Fourteenth Amendments to the U.S. Constitution asserted under 42 U.S.C. § 1983 and Article I §§ 9 & 19 of the Constitution of the State of Texas."(references to exhibits omitted).

2.    In support of this response to the Motion for Summary Judgment, the Defendants rely on the following evidence attached to Defendants' Motion for Summary Judgment [docket # 40]. Each exhibit is incorporated here by reference:

Exhibit A.     Deposition Excerpt of Fannie Garcia
Exhibit B.     Deposition Excerpt of Raquel Buenrostro
Exhibit C.     Deposition Excerpt of Gilbert Buenrostro
Exhibit D.     Deposition Excerpt of Gilberto Navarro
Exhibit E      Deposition Excerpt of Carlos Maldonado
Exhibit F.     Administrative Investigation of F. Garcia
Exhibit G.     Affidavit of Gilbert Magaña
               Exhibit 5- list of files in the cell phone
               Exhibit 1- list of downloaded images
Exhibit H.     Proffer of undisputed facts regarding the events leading up to the arrest of Gilbert
               Buenrostro on November 16, 2008.
Exhibit I.     Letter of Termination
Exhibit J.     Theft report and corresponding statement by Raquel Buenrostro
Exhibit K      City of Laredo Grievance and Appeal Procedures
Exhibit L      Plaintiff's consent to the release of photographs

# I.
## FACTS SUPPORTED BY THE SUMMARY JUDGMENT EVIDENCE

3.    The material facts are undisputed. Defendants, however, take issue with three statements in

Garcia's motion for summary judgment. Garcia states that "Maldonado's termination of Plaintiff's

employment was predicated wholly upon photographs, a video and text messages offloaded from a

mobile telephone owned by Plaintiff." [Plaintiff's MSJ at p. 13] Although it is undisputed that Chief

of Police Carlos Maldonado considered the photographs in the cell phone during Garcia's

termination, there is no support for the statement that the termination was predicated wholly upon

photographs, a video and text messages. Maldonado testified that in terminating Garcia's

employment, he also considered her work conduct and prior disciplinary record. [Exhibit H to

Plaintiff's MSJ at pp. 20-21, 30, 33-34].

4.    The second statement that we dispute is "[T]he texts from the stolen mobile telephone were

photographed and the legal pad upon which Raquel copied texts photo copied by Magaña or

Moncivais. [Exhibit M] The photographs and videos since the date and stamps super imposed upon

the images [sic] were not able to be downloaded to SD card and hard drive. These were photographed by Internal Affairs. [Exhibit J][Exhibit M][Exhibit 6,7,H]." [Plaintiff's MSJ at p. 13] As noted later in this response, only one text message was photographed. [Exhibit G to Defendants' MSJ at ¶ 5]. The photographs were in fact downloaded to a SD card. [*Id.* at ¶ 6]

5.   Garcia states that "Defendant Navarro, Maldonado, Magaña, and Moncivais all had access to the police report field [sic] by Plaintiff on November 16, 2008, two days on leading the download, asserting Plaintiffs ownership of the cell phone." [Plaintiff's MSJ at p. 13] While it is conceded that as police officers and members of the police department staff, Navarro, Maldonado, Magaña, and Moncivais had access to the computers and places where theft police report could be filed, it is disputed that on November 16, 2008, they actually accessed the police report or became aware that Garcia had filed the police report. The exhibits Garcia cited for Garcia's proposition do not support that fact.

6.   Finally, Garcia states that "The City published the illegally accessed and downloaded photos and video used to fire the Plaintiff to the 49th District Court of Webb County, Texas. The Firefighters and Police Officers Civil Service Commission [Exhibit B 22-24][Exhibits "B" "C" "D"&"O"] and The Appeals and Grievance Committee and the Texas Workforce Commission [*Id.*]. [Plaintiff's MSJ at p. 14] Is not clear what Garcia means by "publish." If Garcia intends to say that the material was produced and disseminated during these proceedings, this is partially correct. Only a description of the photos and video was offered 49th District Court of Webb County, Texas, the Firefighters and Police Officers Civil Service Commission and the Appeals and Grievance Committee. The exhibits to which Garcia makes reference do not support the proposition that the photos and videos were actually produced and disseminated during these proceedings. At Garcia's appeal before the Texas

3

Workforce Commission, she signed a release the contents of her internal affairs file, including photographs to the Texas Workforce Commission. A true and correct copy of the release is attached as "Exhibit L."

### Facts Established by the Summary Judgment Evidence.

7.   Since the year 2002, there had been an ongoing intimate relationship between Garcia and Gilbert Buenrostro; he being estranged and /or separated from Raquel Buenrostro. [Amended complaint at ¶ 57]. Raquel Buenrostro and Gilbert Buenrostro, a Laredo Police Officer, married in 1999 and they met at the Police Department [R. Buenrostro's depo. at p. 6 line 18-25, 7 line 1-4], while she was employed as a dispatcher. Eventually, Garcia and Buenrostro became romantically involved. [Garcia's depo. at p. 19-20] During this time, Garcia was under the impression that Gilbert Buenrostro was separated, not living with his wife, and he was going to get a divorce. [Garcia's depo. at p. 22 line 10, 22] Ultimately, this proved not to be true.

8.   Garcia and Gilbert Buenrostro ended the relationship in November of 2008, before the "cell phone incident." [Garcia's depo. at p. 58 line 17-25; p. 59 line 1-4]. During their relationship, Gilbert Buenrostro told Garcia that when he met his then wife, Raquel Buenrostro, he was married with two children. At the time, Raquel Buenrostro was still working as a dispatcher with the Laredo Police Department. According to Garcia, Gilbert Buenrostro never promised Raquel Buenrostro that he was going to divorce his wife because he did not want a divorce and wanted to stop the relationship with Raquel Buenrostro. Gilbert Buenrostro also told Garcia that his wife found out about his affair with Raquel Buenrostro and divorced him. [Garcia's depo. at p.  47-48].

9.   To maintain the privacy of their relationship and to facilitate their daily communication, Garcia loaned Gilbert Buenrostro the mobile / cellular telephone issued to her by AT&T and assigned the

telephone number ending in 08 (hereinafter the "cell phone") to Gilbert Buenrostro. [Amended complaint at ¶ 58.] Before that time, Gilbert Buenrostro had been using a pay phone to communicate with Garcia in secret. [Garcia's depo. at p. 65]

10.    When Garcia met Gilbert Buenrostro, she understood that Gilbert Buenrostro had told Raquel Buenrostro that he was seeing Garcia. [Garcia's depo. at p. 62 line 12] She also understood that he was separated from his wife, but stopped their relationship when she found out that Gilbert Buenrostro was seeing his wife. [Garcia's depo. at pp. 62, line 12; 65-66] Garcia would also stop the relationship everytime she found out that Gilbert Buenrostro went back to his wife. [Garcia's depo. at p. 65-66 line3-10] Between affairs, Garcia would get the cell phone back from Gilbert Buenrostro. [Garcia's depo. at p. 66 line 11-19] Garcia would then give the cell phone back to Gilbert Buenrostro every time they resumed their affair. [Garcia's depo. at p. 66 line 16].

11.    However, after ending their relationship in November 2008, Garcia allowed Gilbert Buenrostro to retain the cell phone, which later proved an unwise decision. Garcia did so because, although they were no longer intimate, they were still friends, still kept in contact with each other and she trusted him with the phone. [Garcia's depo. at p. 59 line 20; p. 60 line 1; p. 61 line 4-14] Garcia did not fear that Raquel Buenrostro would ever find out about the cell phone and she did not think to much about it. [Garcia's depo. at p. 61-62] Garcia was afraid of Raquel Buenrostro because she was capable of hurting her and her family. She had tormented her for so many years, but Garcia never contemplated the idea that Raquel Buenrostro would find the cell phone, she was not concerned about it and it would not have made much of a difference to her. [Id.; p. 78 line 12]

12.    The Police Substation where Gilbert Buenrostro was required to report for duty contained a locker assigned to Gilbert Buenrostro for the storage of his personal effects. [Amended complaint

5

at ¶ 65] During his off duty hours, Gilbert Buenrostro would use this locker assigned to him by the City to store the cell phone loaned to him by Garcia. [Amended complaint at ¶ 66.] The locker at Gilbert Buenrostro's workplace was commonly used by him to place and store his clothing and his personal effects while he was on duty as a police officer for the City. [Amended complaint at ¶ 67] Among those personal effects was the cell phone loaned him by Garcia. [Amended complaint at ¶ 68]

13.    This locker contains a door which precludes others from seeing or accessing its contents. [Amended complaint at ¶ 71] However, while other police officers locked their respective lockers, Gilbert Buenrostro always kept his locker door unlocked. [G. Buenrostro's depo. at p. 10, line 19-25; p. 12 line 9] While other lockers displayed a name or a lock, Gilbert Buenrostro's locker did not have a name, number or lock that could identify it as his locker. [G. Buenrostro's depo. at p. 58]. The Substation had 12 lockers. [Id.] Anyone with access to the Substation, including the police officers assigned to the Substation could get into Gilbert Buenrostro's locker to see what he had there. [G. Buenrostro's depo. at p. 11 line 1-2; p. 12 line 2-9]. About 12 officers were assigned to the Substation in three shifts of eight hours. [G. Buenrostro's depo. at p. 11 line 6-15] Gilbert Buenrostro kept his locker unlocked for his convenience and to avoid delays. [G. Buenrostro's depo. at p. 12 line 12] Garcia had previously been at the Substation to give Gilbert Buenrostro a ride or because of the ride-along program. [Garcia's depo. at p. 79 line 11-22; p. 48] Garcia knew that Gilbert Buenrostro kept the cell phone in the unlocked locker and she had no problem with that. [Garcia's depo. at p. 79 line 4-23] Gilbert Buenrostro found objectionable the Defendants' downloading of the photographs but not actually seeing the photos. [G. Buenrostro's depo. at p. 83 line 10 though p. 84.]

6

14.     Before November 2008, Garcia had numerous confrontations with Raquel Buenrostro regarding her relationship with Gilbert Buenrostro. [Garcia's depo. at p. 24] Those confrontations occurred on the phone and in person. [*Id.*]  Raquel Buenrostro repeatedly telephonically contacted the Plaintiff to inquire about the nature of the Plaintiff's relationship with Gilbert Buenrostro; she being told by the Plaintiff to discuss the matter with him (Gilbert Buenrostro). [Amended complaint at ¶ 57b.]

15.     The confrontations between Garcia and Raquel Buenrostro also took place while Garcia was on duty. Raquel Buenrostro called Garcia numerous times at the Police Department on Garcia's cell phone and on the land line while she was on duty. [Garcia's depo. at p. 51; 55-56; 57 line12; R. Buenrostro's depo. at p. 45-46] Garcia did not know how Raquel Buenrostro knew when Garcia was at work or how Raquel Buenrostro found out about all the shifts Garcia was working. They changed shifts every three months. [Garcia's depo. at p. 56 line 13-21] During these confrontations, Raquel Buenrostro insulted and called Garcia horrible names and would accuse Garcia of being with her husband and going out with her husband. [Garcia's depo. at p. 52 line 11-15; 58 line 6-16] Even after Garcia told Raquel Buenrostro that Garcia no longer had anything to do with Gilbert Buenrostro, Raquel Buenrostro would harass and attack her and tried to pick a fight with Garcia. [Garcia's depo. at p. 55, line 1-11]  Raquel Buenrostro would also harass some of Garcia's co-workers and other officers that worked with G. Buenrostro. [Garcia's depo. at p. 52] Raquel Buenrostro was very persistent in calling Garcia even after Garcia told her that she was not with Gilbert Buenrostro the night before. [Garcia's depo. at pp. 55-56; 58 line 9].

16.     On one occasion, Raquel Buenrostro went to Garcia's residence while Garcia was absent and pounded on the window harassing Garcia's elderly mother and causing her to fear for her safety.

[Amended complaint at ¶ 57c.] In December 2007, Raquel Buenrostro went to Garcia's mother's apartment and started banging on the door demanding to get in. Garcia's mother was sick and Garcia was not at the apartment. [Garcia's depo. at p. 29; p. 30 line 9-14; p. 31 line 14-15] Raquel Buenrostro tried opening the door but it was locked. [*Id.*] Garcia's mother called Garcia crying hysterically that there was a lady outside trying to break the door and pounding at the window asking for Garcia and demanding to talk to Garcia and for Garcia's mother to let her in. [Garcia's depo. at pp. 29-30] Garcia called the Laredo Police Department and Raquel Buenrostro left when she saw the officers. [Garcia's depo. at p. 31]

17.   Mrs. Buenrostro would also follow Garcia to her parents' house where personal confrontations would take place in the presence of Garcia's parents. [Garcia's depo. at p. 24] Garcia never found out how R. Buenrostro found out her address. [*Id.*] [Amended complaint at ¶ 57d.] On one occasion, Garcia got off work and she noticed a white vehicle following her and honking at her to stop. She didn't know who the driver was. When Garcia got off at her house, she noticed Raquel Buenrostro who got off the vehicle and tried to pick a fight with her. She told her she was Gilbert Buenrostro's wife and if she didn't want to talk, she was going to demand some answers from her. [Garcia's depo. at p. 28] Raquel Buenrostro was verbally aggressive. Garcia has always been afraid of Raquel Buenrostro and feared for her safety as well as the safety of her parents. [Garcia's depo. at p. 29].

18.   Garcia recalls that the police had to be called more than five times regarding Raquel Buenrostro. [Garcia's depo. at p. 32, line 19-24] Garcia filed five or six police reports against R. Buenrostro for harrasment and stalking. [Garcia's depo. at p. 33, 36 line 15.] Plaintiff reported Raquel Buenrostro's harassment to the Police Department for several years yet the Police Department in concert with the Webb County District Attorney failed and refused to take action.

8

[Amended complaint at ¶ 57e.] During the times set forth above, two of R. Buenrostro's brothers, surnamed Gonzalez were classified Police Officers employed in the City of Laredo Police Department. [Amended complaint at ¶ 57f.]

19.    Garcia never admitted to R. Buenrostro that she was in an intimate relationship with her husband, but she did confess to her that she was in love with him and asked her to stop tormenting and terrorizing her, her parents and friends. [Garcia's depo. at p. 53].

20.    On November 15, 2008 between 7:00 p.m. 9:00 p.m., Raquel Buenrostro gained access to the Police Substation using her husband's keys. [R. Buenrostro's depo. at p. 7 line 16-19; p. 8 line 11-14; p.11 line 1-9] Raquel Buenrostro obtained the keys while Gilbert Buenrostro was out with the children at a party. [R. Buenrostro's depo. at p. 9 line 14-16] Gilbert Buenrostro had left the keys at the house, where all their keys are usually left. [G. Buenrostro's depo. at p. 10, line 1-18; R. Buenrostro's depo. at p. 9 line 12-16; p. 11 line 10-11]  The key to the substation was in a key ring together with the truck, house and handcuffs' keys. [G. Buenrostro's depo. at p. 59, line 14-17] Raquel Buenrostro knew that Gilbert Buenrostro's workplace was at the Police Substation. [R. Buenrostro's depo. at p. 9 line 17-21] She also knew where his locker was located because she had been at the Police Substation twice. [R. Buenrostro's depo. at p. 9 line 22-25 ] Raquel Buenrostro knew that Gilbert Buenrostro kept personal property at the locker. [R. Buenrostro's depo. at p. 10 line 13-17] The locker was closed but did not have a lock. [R. Buenrostro's depo. at p. 10 line 18-25] At the time she obtained the cell phone, Raquel Buenrostro thought that the cell phone belonged to her husband. [R. Buenrostro's depo. at p. 29 line 1-12; p. 34 line 13-23; p. 51 line 20-22]

21.    Raquel Buenrostro went to the Police Substation to verify whether Gilbert Buenrostro was having an affair. [R. Buenrostro's depo. at p. 52 line 6-10] She did not want to divorce Gilbert

Buenrostro if he was not having an affair. [R. Buenrostro's depo. at p. 52 line 12-16] Her main

concern was protecting her children from a divorce. [R. Buenrostro's depo. at p. 52 line 17-23]

22.   Raquel Buenrostro did not have permission from the owner of the building (the City of Laredo)

or anyone from the Police Department to enter the Police Substation. She did not ask for permission.

[R. Buenrostro's depo. at p. 7 line 16-25; p. 8 line 1-10; G. Navarro's depo. at p. 17 line 1-17; [C.

Maldonado's depo. at p. 10 line 10-12; p. 11 line 25; p.12 line 1-7; G. Magaña's depo at p. 22 line

25; p. 23 line 1-25 ].

23.   After getting the cell phone, Raquel Buenrostro left and stopped in a parking to look at the

pictures and text messages. [R. Buenrostro's depo. at p. 12 line 5-13] She then drove home. [R.

Buenrostro's depo. at p. 12 line 10-15] At the house she confronted Gilbert Buenrostro. [R.

Buenrostro's depo. at p. 15 line 2-7].

24.   An altercation ensued between Raquel Buenrostro and Gilbert Buenrostro which extended to

the following Sunday morning. See "Exhibit H."

25.   On the following day and for at least two days thereafter Raquel Buenrostro utilized the cell

telephone to generate text messages to Garcia to threaten, intimidate, and harass Garcia. [Amended

Complaint at ¶ 76] One such text message invited Garcia to fight. [Amended Complaint at ¶ 76a ]

Upon her receipt of the harassing texts and concerned about her personal safety, Garcia on or about

November 16 of 2008, filed a Police report asserting that the cell phone had been stolen. [Amended

Complaint at ¶ 77]  Prior to Garcia's filing of the Police report, Garcia enlisted the assistance of Sgt.

Gilbert Villarreal, a Police Officer to retrieve the stolen mobile telephone from Buenrostro.

[Amended Complaint at ¶ 78] Gilberto Villarreal unsuccessfully attempted to retrieve the telephone

from Raquel Buenrostro without the necessity of the filing of a formal Police report and

corresponding formal theft complaint. [Amended Complaint at ¶ 78a]  Raquel Buenrostro had no ownership interest in or possessory interest in the [08] cell phone. [Amended Complaint at ¶ 78b] On or about November 18, 2008, after having stolen the Plaintiff's cell phone, Raquel Buenrostro telephonically contacted Collazo and indicated to Collazo that she wished to meet with Collazo in order to discuss her husband's conduct and behavior. [Amended Complaint at ¶ 79]

26.   Raquel Buenrostro mentioned to Collazo that she had something that Ms. Collazo might want to see of a sexual nature. Raquel Buenrostro told Collazo that she could not go to City Hall and asked Ms. Collazo if she wanted to come to her house and she agreed to go the next day. Raquel Buenrostro could not go to City Hall because at the time she had a baby who was a year old who took naps and she didn't want to have anyone help with her children or disturb their schedule. [R. Buenrostro's depo. at p. 56 line 7-23]

27.   According to Raquel Buenrostro, she called Collazo because she knew that the cell phone had to be turned over for evidence on account of the theft report. [R. Buenrostro's depo. at p. 16 line 6-13; p. 54 line 7-16] By that time, Raquel Buenrostro knew that a theft report had been made, but did not know who had filed the report. [R. Buenrostro's depo. at p. 17 line 20-25; p. 18 line 1-12] Raquel Buenrostro thought that if she turned the cell phone into the police department, whatever evidence it had might be destroyed because Gilbert Buenrostro and Garcia had friends in the police department. [R. Buenrostro's depo. at p. 54 line 7-16] Before the phone conversation, Raquel Buenrostro was not previously acquainted with Collazo and talked to her because she feared that there might be a cover up.[R. Buenrostro's depo. at p. 55 line 1-14]

28.   When Raquel Buenrostro talked to Collazo, Raquel Buenrostro was under the understanding that because Gilbert Buenrostro had been arrested, he filed the theft report against her to get her

arrested. [R. Buenrostro's depo. at p. 51 line 7-11] At the time, she also did not know that the cell phone belonged to Fannie Garcia. [R. Buenrostro's depo. at p. 51 line 12-15] She was acting on the belief that it was her husband's cell phone. [R. Buenrostro's depo. at p. 51 line 20-22]

29.   After reviewing the pictures in the cell phone, Raquel Buenrostro also believed that Gilbert Buenrostro was having his affairs during duty hours. [R. Buenrostro's depo. at p. 55 line 20-25]

30.   Collazo and Interim Police Chief Gilbert Navarro ("Navarro") met with Raquel Buenrostro around noon at Buenrostro's residence at xx5 Cxxxt in Laredo, Texas. [Amended Complaint at ¶ 82] At that meeting, R. Buenrostro produced to Collazo and Navarro the cellular telephone purchased by Garcia under Garcia's subscription plan for wireless service with AT&T. [Amended Complaint at ¶ 86]  More particularly, Raquel Buenrostro  produced to Navarro and Collazo the cellular telephone ending in '08.("cellular telephone). [Amended Complaint at ¶ 87]   At that meeting between R. Buenrostro, Collazo and Navarro, Raquel Buenrostro  utilized the cell phone to access and display to these city officials digitally and electronically stored images and videos of the Plaintiff and Gilbert Buenrostro. [Amended Complaint at ¶88 ]

31.   R. Buenrostro also produced to these high ranking City officials a legal pad containing handwritten memorializations of text messages exchanged between the Plaintiff's cell phone with the assigned subscriber telephone number ending in 65 and the cell phone with the assigned subscriber telephone number ending in 08. [Amended Complaint at ¶ 91; R. Buenrostro's depo. at p. 31 line 21-25; p. 32 line 1-7];   In order to hand copy and create the written verbatim memorialization of the text exchange between the two cell phones R. Buenrostro procured these by accessing, utilizing and operating the 08 cell phone's text message file where these texts were stored in that facility, and viewing the content of these texts. [Amended Complaint at ¶ 92] R. Buenrostro

utilized that cell phone to access and to share with Collazo and Navarro the text messages sent from and received by that facility. [Amended Complaint at ¶ 93]

32.    R. Buenrostro utilized that cell phone to access and to share with Collazo and Navarro the digital images photographs and videos stored on that facility. [Amended Complaint at ¶ 94] Both Navarro and Collazo read and reviewed the handwritten verbatim memorializations of the text messages. [Amended Complaint at ¶ 96].

33.    After accessing and viewing all the digitally transmitted photos, videos and texts which were stored on the '08 cellular telephone, Navarro and Collazo summoned Magaña, one of the Police Department's Internal Affairs Investigators, to the residence of Raquel Buenrostro. [Amended complaint at ¶ 97a]

34.    Magaña took possession of Raquel Buenrostro's handwritten notes and later made them a part of his investigation file. [Magaña's affidavit at ¶ 3] True and correct copies of the ten pages of handwritten notes are attached as "Exhibit 5" to Magaña's affidavit. [*Id.*] In pages numbered "1P" and "2P" Raquel Buenrostro also described the 32 photos and one video depicting Gilbert Buenrostro and Raquel Buenrostro. [*Id.*]

35.    At the police department, Moncivais successfully downloaded one video recording and 32 digital images depicting either Gilbert Buenrostro by himself, Fannie Garcia by herself or both of them on the same image.  [Magaña's affidavit at ¶ 6] These images were saved to a memory card known as "SD card." Inv. Moncivais could not download any of the text messages. A screen print of the files downloaded from the cell phone are attached as "Exhibit 1" to Magaña's affidavit.  [*Id.*] Magaña and Moncivais also downloaded 4 images of a music concert featuring the band "Los Tigres Del Norte." These images are also referenced  in page "1B" of Raquel Buenrostro's notes (Exhibit

5).  [Magaña's affidavit at ¶ 8].

36.   Magaña compared Raquel Buenrostro's handwritten notes describing the video and 32 pictures with the 32 images and the video he downloaded from the cell phone on November 19, 2008 (Exhibit 1 to Magaña's affidavit).  Raquel Buenrostro's description of the pictures corresponds with the depictions of the 32 images and the video Magaña had downloaded from the cell phone. [Amended Complaint at ¶8 ].

37.   On or about November 19, 2008, R. Buenrostro filed a formal written Internal Affairs complaint against Garcia. [Amended Complaint at ¶107 ];  Magaña, the Internal Affairs Investigator assigned the duties of investigating R. Buenrostro's complaint against the Plaintiff concluded that Garcia had violated Police department rules and regulations by having engaged in an extramarital affair with a police officer during her duty hours. [Amended Complaint at ¶ 109].

38.   Garcia was terminated from her municipal employment as a Civilian Dispatcher at the Police Department by Maldonado, based in whole or in part upon the above described images and text messages retrieved from the cell phone belonging to her. [Amended Complaint at ¶ 113].

## II
## STORED COMMUNICATIONS ACT

1.   Garcia contends that digital photos, a video[1] and text messages saved in cell phone that Gilbert Buenrostro used, were in "storage," and the access to these files without a warrant violated the Electronic Communications Act (SCA). Garcia offers no other argument for the proposition that the SCA applies to the contents of her cell phone. Garcia cites *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 904 (9th Cir. 2008) reversed in part, *Ontario v. Quon*, 130 S. Ct. 2619, 177 L.

---

[1]  The motion for summary judgment refers to "videos." The defendants produced two videos, however, they are copies of the same video.

Ed. 2d 216 (2010), for the proposition that the text messages in question were "electronic communications" pursuant to the Stored Communications Act, 18 U.S.C. § 2701, *et seq*. ("SCA") The Defendants do not contest that the text messages in the cell phone were "electronic communications" and that some of the digital photos downloaded from the cell phone in question qualify as "electronic communications." As explained later in this response, some of the digital photos saved to the cell phone were taken with the cell phone's camera where they resided until the Defendants downloaded them. As such, they were not electronically transmitted to that cell phone and do not constitute "electronic communication." Regarding the video file, it is not known how it ended up in the cell phone in question. For the purpose of this response we assume that some of the digital photos and a text message which the Defendants accessed, are "electronic communications" under the SCA.

2.   Garcia cites Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 George Washington L. Rev. 1701 (2004).  Here, the author is critical of two cases. One case is *Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004), on which the Plaintiff relies and the other is *In re DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497, 153 - Dist. Court, SD New York 2001, cited by the Defendants. Although Kerr argues that *Theofel* was decided incorrectly, as shown next, Mr. Kerr's arguments and the *Theofel* decision do not provide any support to Garcia's claim under the SCA.

### A.      Kerr and the Storage Communications Act

3.   According to Kerr,

>     the "focal point of the SCA is the set of network service providers  regulated by the
>     statute . . .   The SCA provides privacy protection to communications held by two
>     types of providers. As the 1986 Senate Report on the SCA explains, computer

network account holders at that time generally used third-party network service providers in two ways. First, account holders used their accounts to send and receive communications such as e-mail. The use of computer networks to communicate prompted privacy concerns because in the course of sending and retrieving messages, it was common for computers to copy the messages and store them temporarily pending delivery. The copies that these providers of "electronic communication service" created and placed in temporary "electronic storage" in the course of transmission sometimes stayed on a provider's computer for several months. The second reason account holders used network service providers was to outsource computing tasks. For example, users paid to have remote computers store extra files or process large amounts of data. (This was in the era before spreadsheet programs, so users generally needed to outsource tasks to perform what by today's standards are simple number-crunching jobs.) When users hired such commercial "remote computing services" to perform tasks for them, they would send a copy of their private information to a third-party computing service, which retained the data for storage or processing. Remote computing services raised privacy concerns because the service providers often retained these copies of their customers' files for long periods of time. Kerr at 6-8.

4.   If, as Kerr proposes, the application of the SCA depends on whether a provider of an electronic communication service or a provider of remote computing services stores protected electronic communications, then Garcia's claim fail as matter of law. Garcia is neither a provider of an electronic communication service nor a provider of remote computing services.[2] Nor it can be said that Garcia was the user of a communications service because Gilbert Buenrostro was the user of the phone and the end user of the communications services AT&T provided to transmit files to the cell phone. Garcia was simply the owner of a cell phone. Whether Garcia benefitted from the photos, messages and video exchanged with Gilbert Buenrostro, is of no relevance. To be sure, the amended complaint has no allegation indicating that Garcia provided any such services or that the Defendants

---

[2]   An electronic communication service is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15); 18 U.S.C. § 2711(1) (making the Wiretap Act's definitions applicable to the Stored Communications Act). A provider of remote computing services provides "to the public... computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2).

16

accessed an AT&T facility and obtained the files in question from it.

### B.      *Theofel v. Farey-Jones*

5.    In *Theofel*, a civil defendant subpoenaed emails held on the Internet Service Provider ("ISP") of the plaintiffs' employer. *Theofel*, 359 F.3d at 1071. The ISP granted the defendant's attorneys access to emails that remained on its server after users received them through their workplace email program. *Id.* at 1075. The Ninth Circuit concluded that this production violated the Stored Communications Act, in part because it found that the emails were stored for backup protection and thus were in electronic storage. *Id.* at 1071.

6.    The Ninth Circuit held that once a user receives an email, any version on the ISP's server is a copy that is being stored for backup until the user's version "expire[s] in the normal course." *Id.* at 1070.  *Theofel* is of no help to Garcia for two reasons. The defendants obtained the emails directly from the ISP, a provider of electronic communication services. As noted above, Garcia did not provide those services. Second, the files saved in the cell phone were not in "storage" for the purpose of the SCA.

### 1.      Intermediate Storage

7.    Garcia's cell phone saves in its memory digital images from three sources: those taken by cell phone's built-in camera, images received by the cell phone as text messages and images transmitted to the cell phone wirelessly (Bluetooth.) [G. Buenrostro's depo. at p. 21-24]. The images taken by the built-in camera do not involve a "wire or electronic communication" because the phone is only acting as a camera. Once the digital images and text messages are delivered by the service provider to the cell phone, the transmission is complete and the information resides in post-transmission storage in the phone's memory. There was no "temporary, intermediate storage" of a digital image

or text message within the cell phone incidental to the electronic transmission thereof as in *Theofel*. *See Ontario v. Quon*, 130 S. Ct. 2619, 2625, 177 L. Ed. 2d 216 (2010)(analogizing emails with text messages transmitted over a cell phone.) This is consistent with Garcia's amended complaint at ¶¶ 46-52a. Therefore, the SCA does not apply to her cell phone on the basis that the files in question were not in "temporary, intermediate storage" when the Defendants accessed them. Nor were they in backup storage.

### 2.    Backup Protection

8.    *Theofel* concluded that the emails were in storage with the ISP "for purposes of backup protection," in which case they are in "electronic storage" and protected by the warrant requirement. *Theofel*, 359 F.3d at 1075.  According to the Ninth Circuit:

> An obvious purpose for storing a message on an ISP's server after delivery is to provide a second copy of the message in the event that the user needs to download it again–if, for example, the 772*772 message is accidentally erased from the user's own computer. The ISP copy of the message functions as a "backup" for the user. Notably, nothing in the Act requires that the backup protection be for the benefit of the ISP rather than the user. Storage under these circumstances thus literally falls within the statutory definition.

*Id.* at 1070.

9.   Garcia's digital images, including the video and text messages in the cell phone were not stored for purposes of "backup protection" as required by the SCA. Garcia had no other purpose for saving these files in the cell phone than to share them with Gilbert Buenrostro and saving them for future viewing. [Garcia's depo. at p. 67 line 7-12; p. 74 line 20-24; p. 75 line 9-25; p. 76 line 18-25; p. 77 line 1-25; p. 78 line 1-11]  These files resided in the cell phone in permanent storage and not the purpose of backup as provided by the SAC. The claim must, therefore, be  dismissed on that basis.

### C.   *In re Doubleclick Inc. Privacy Litigation*

10.   *In re DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497, 153 - Dist. Court, SD New

York 2001, is also the subject of Kerr's disapproval. *See* Kerr, at 8-9. According to Kerr, although

"a home computer configured as a mail server could provide ECS in theory, the home computer of

an end user is not protected by the SCA. This is consistent with the SCA's purpose: home computers

are already protected by the Fourth Amendment, so statutory protections are not needed." *Id* at 9.

11.   The district court in *Doubleclick, however,* refused to give SCA protection to Plaintiffs' home

computer for a least two different reasons. First, the court found that the plaintiffs were not

"electronic communication service" providers. 154 F. Supp. 2d at 511. Second, the Court relying on

legislative history found that the files  in question were not in "electronic storage:"

> Section 2510(17)(A)'s language and legislative history make evident that "electronic
> 512*512 storage" is not meant to include DoubleClick's cookies either. Rather, it
> appears that the section is specifically targeted at communications temporarily stored
> by electronic communications services incident to their transmission-for example,
> when an email service stores a message until the addressee downloads it. The
> statute's language explicitly refers to "temporary, intermediate" storage. Webster's
> Dictionary defines "temporary" as "lasting for a limited time," and "intermediate" as
> "being or occurring at the middle place...." Webster's Third New International
> Dictionary 2353, 1180 (1993). In other words, Title II only protects electronic
> communications stored "for a limited time" in the "middle" of a transmission, i.e.
> when an electronic communication service temporarily stores a communication while
> waiting to deliver it.
>
> The legislative history reveals that Congress intended precisely this limited
> definition. In H. Rpt. 106-932 (2000), a House Report on a proposed amendment to
> Title II, the House Judiciary Committee explained that "`(A)ny temporary,
> intermediate storage' [in § 2510(17)(A)] describes an e-mail message that is being
> held by a third party Internet service provider until it is requested to be read." Id. at
> note 6 (emphasis added). This definition is consistent with Congress' statements in
> 1986, when it passed the ECPA. Sen. Rep. No. 99-541 (1986)'s entire discussion of
> Title II deals only with facilities operated by electronic communications services such
> as "electronic bulletin boards" and "computer mail facilit[ies]," and the risk that
> communications temporarily stored in these facilities could be accessed by hackers.

It makes no mention of individual users' computers, the issue in the instant case. Finally, Senator Patrick Leahy, a sponsor of the ECPA in 1986, recently proposed an amendment to the definition of "electronic storage" meant to clarify its scope. He proposed amending 2510(17)(A) to read:

> (17) ["interim storage"] means-
>
> > (A) "any temporary, intermediate storage [by an electronic communication service] of a wire or electronic communication incidental to the electronic transmission thereof ..." S. 106-3083, Sec. 3(a)(4) (2000).

This amendment lends further support to the conclusion that Congress' intent was to protect communications held in interim storage by electronic communication service providers.

*Id.* at 512.

12.    Under either the Kerr approach or the *Doubleclick* rationale, Garcia's claims fail. While a cell phone, like a computer, can send and receive electronic communications, to receive SCA protection, Garcia must be a "communications service provider," which she was not, and her cell phone's files must be in "electronic storage" which they were not.

###     D.    *In re Application of the United States of America for Historical Cell Site Data*

13.    Finally, Garcia relies on the decision in *In re Application of the United States of America for Historical Cell Site Data*, ___ F.Supp.2d ___, 2010 U.S. Dist. LEXIS 115529, 2010 WL 4286365, (S.D. Tex. Oct. 29, 2010), for the proposition that a judge in the "the Southern District of Texas has recognized the evolution of technology as outstripping the decisional case authority construing the Stored Communications Act, and recognized cellular telephones services to be "electronic communications services."  Garcia's reliance on this decision is misplaced for several reasons. The

decision has nothing to do with electronic communications stored in a cell phone.[3] The issue in that case was whether the Government was entitled under the SCA to obtain from the cell phone service provider (the telephone company) cell-phone-derived movement/location information ("cell site data") without a warrant. Significantly, this case is not about the interpretation of the SCA as it relates to any of the issues before this Court; and when the U.S. Magistrate Judge stated "caselaw developments have been outstripped by advancing technology," the technology in question is cell phone location technology and not the cell phone capacity to send and receive digital images. U.S. Dist. LEXIS at *5-6. Lastly, there is nothing in this decision that can be reasonably construed as recognizing "cellular telephones services to be 'electronic communications services.'" While it is true that cell phone companies provide electronic communications services, there are no pleading or facts showing that Garcia's phone provided "electronic communications services."

### D.    Dissemination of Protected Communications

14.    Garcia claims that the Defendants violated the SCA by using and disseminating the contents of the cell phone.  There is no basis of recovery on those grounds. While SCA punishes the act of accessing a "facility through which an electronic communication service is provided" in an unauthorized manner, the SCA does not punish disclosing and using the information obtained therefrom. *Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F.Supp.2d 817, 820 (E.D.Mich.2000). As the *Sherman* court clearly stated, "section 2701(a) of the EPCA does not prohibit the disclosure or use of information gained without authorization.... Rather, section 2701(a) prohibits the intentional unauthorized access of an electronic communication service . . . ". *Id*. See

---

[3]  "For network-based location [of the cell phone], the position of the phone is calculated by the network based on data collected and analyzed at the cell site receiving the phone's signals, without explicit assistance from the user or his handset. U.S. Dist. LEXIS at *10.

also, *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 558-59 (N.D.Tex.2005) (collecting

cases and stating "the purpose of section 2701 is to prevent unauthorized access to a facility through

which an electronic communication service is provided.... It appears evident that the sort of

trespasses to which the [SCA] applies are those in which the trespasser gains access to information

to which he is not entitled to see, not those in which the trespasser uses the information in an

unauthorized way ....") (internal citation omitted); *Wesley College v. Pitts*, 974 F.Supp. 375, 389

(D.Del.1997) (finding that the ECPA "does not censure the disclosure or use of the contents of those

stored communications unless the disclosing party or using party is the provider of an electronic

communication service" as defined in section 2702). Garcia is no entitled to summary judgment on

that claim.

### III.

### FOURTH AND FOURTEENTH AMENDMENT PRIVACY

15.   Garcia also moves for summary judgment arguing that the search and seizure of the cell phone

violated the Fourth and Fourteenth Amendment. The motion should be denied because as matter of

law the Plaintiff had no expectation of privacy in the contents of the cell phone, there was no

"seizure" under the Fourth Amendment and alternatively, the "Special Needs" of the workplace

exception to the warrant requirement justified the search.

### 1.   No Legitimate Expectation of Privacy Was Invaded

16.   The Court should deny Garcia's claims because she had no legitimate expectation of privacy.

In determining whether a party has a reasonable expectation of privacy sufficient to contest the

validity of a search, we inquire "(1) whether the [a party] is able to establish an actual, subjective

expectation of privacy with respect to the place being searched or items being seized, and (2)

22

whether that expectation of privacy is one which society would recognize as reasonable." *United States v. Cardoza-Hinojosa*, 140 F.3d 610, 614 (5th Cir. 1998) (quoting *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037-38 (5th Cir. 1990)). The factors the courts consider include whether the party has a property or possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy, and whether he was legitimately on the premises. *Id.* at 1038. *United States v. Setser*, 568 F.3d 482, 490-491 (5th Cir. Tex. 2009).

17.    The following facts are established in Garcia's affidavit attached to her motion for summary judgment as "Exhibit A:"

> Given the on-going harassment at the hands of Raquel Buenrostro, and to ensure privacy between Gilbert Buenrostro and myself; and that no one at my workplace would know about or discuss our relationship, I purchased, on my AT&T cellular subscription service a mobile telephone to lend to Gilbert Buenrostro so that we could call each other, exchange texts, videos and photographs.

> When I loaned the physical possession of the mobile telephone on my AT&T subscription plan to Gilbert Buenrostro, it was on the condition that Gilbert Buenrostro was to retain possession of this instrumentality at all times and to not lend it or disclose his possession and my ownership of the [08] mobile telephone to anyone else.

> When I loaned this mobile telephone to Gilbert Buenrostro, it was with the express understanding that he would store the cellular telephone in his locker at the Police Substation to ensure no one knew it was my cellular telephone that I was loaning to him to ensure complete discretion and privacy in our communications with one another.

18.    In situations such as the one before the court, where the parties have common authority over the object or place they intend to keep private, because the first party asserting the privacy right "has already substantially ceded his or her expectation of privacy" to the second party, the first party has

"assum[ed] the risk" that the second party might expose his or her privacy interest to others. *United States v. Shelton*, 337 F.3d 529, 535-36 (5th Cir. 2003); see also *Smith v. Maryland*, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 2582, 61 L.Ed.2d 220 (1979)("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.") Here, Garcia and Gilbert Buenrostro had common authority over the cell phone. Unquestionably, while the cell phone was in the locker and outside Garcia's possession, Garcia had no control over cell phone, could not exclude others from the cell phone nor could she take precautions to maintain the privacy of the property. *See Setser*, 568 F.3d at 490-491. Other than her understanding that Gilbert Buenrostro would store the cellular telephone at the Police Substation in an unlocked locker, Garcia took no other precautions to assure privacy.

19.    Twenty-four hour a day, the cell phone was exposed to those law enforcement officers who had access to the lockers and to those, including janitors, friends, relatives, etc., who may be given permission to enter the Substation. Once Gilbert Buenrostro left the Substation, he also lost control over those who could have gained access to the locker area thereby exposing his and Garcia's privacy interest over the cell phone to others. This Garcia knew. On her own admission she had no problems with it. This is consistent with Garcia's lack of concern about the possibility that Raquel Buenrostro could find the cell phone after she ended the affair with Gilbert Buenrostro.

20.    Had Garcia truly wanted to limit access to the locker, she could have asked Gilbert Buenrostro to place a lock on it and to keep the key where his wife could not find it. Even better, after ending the affair, she could have deleted from the cell phone all evidence of infidelity or could have asked ask Gilbert Buenrostro to do so. In contrast to what Garcia had normally done in other occasions, Garcia decided not to get the cell phone back from Gilbert Buenrostro after the affair terminated.

24

Under these circumstances, Garcia did not have a subjective expectation of privacy and it certainly was not reasonable.

21.   In a situation like this one there is no doubt always exist forces pushing the spouse to find out the infidelities of the other spouse. Among these are the simple but often powerful fear that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful to the betrayed spouse. No one knew better about the suspicious nature of Raquel Buenrostro than Garcia. [*See* Garcia's affidavit attached to her motion as "Exhibit A" at ¶¶ 7-15] After all, Garcia endured years of confrontations, harassment and stalking during Raquel Buenrostro's relentless pursuit for the truth about her husband's infidelities. Garcia knew that Raquel Buenrostro was persistent and that she never gave in, even during the times when Raquel Buenrostro and Gilbert Buenrostro were together. By leaving his keys unattended, Gilbert Buenrostro invited Raquel Buenrostro to once again satisfy her curiosity. Under the circumstances described above, it cannot be said that Garcia could not have anticipated the risk of Raquel Buenrostro getting a hold of Gilbert Buenrostro's keys to search places where he would kept personal effects, such as his pickup truck and the locker at the Substation. These were places and personal effects over which, without a key, Raquel Buenrostro lacked access when she and Gilbert Buenrostro were separated.

22.   The nature of the intrusion can affect whether a person has a reasonable expectation of privacy; while a person may not have such an expectation from one type of search, he or she reasonably may expect privacy with respect to another. *See Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967))(holding that a person in a glass phone booth has a reasonable expectation that his or her conversation will not be intercepted, but he or she does not have a reasonable expectation that people will not view his or her actions while in the booth); *Bond v.*

*United States*, 529 U.S. 334, 338-39, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000)("When a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another. . . . He does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner."); *United States v. Taketa*, 923 F.2d 665, 676 (9th Cir.1991) (finding that while a person might not have a general privacy interest in another person's office, he or she may have an expectation against being videotaped in it).

23.    Garcia admitted that all the photos in the cell phone depicted Gilbert Buenrostro in police uniform and that he probably was on duty at the time. [Garcia's depo. at p. 116, line 16-22]  Having engaged for so many years in this adulterous and controversial relationship characterized by dishonesty, secretive behavior, infidelity, mistrust, lies, disputes at the workplace, and finally theft charges involving a cell phone containing graphic evidence of that infidelity, Garcia may not reasonably expect privacy with respect to Raquel Buenrostro in places and personnel effects accessible to Raquel Buenrostro as the wife of the person with whom Garcia is having an affair. Certainly this is not an expectation of privacy that society is prepared to consider reasonable. *See* e.g., *City of Sherman v. Henry*, 928 S.W.2d 464, 471-472 (Tex. 1996)("... the right to privacy under the United States Constitution does not include the right to maintain a sexual relationship with the spouse of someone else. Such conduct is the antithesis of the constitutionally protected rights of marriage and family; a right to engage in that conduct can  hardly be said to be "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition.")

24.    Garcia assumed the risk that Raquel Buenrostro could or would intrude into her affair with her husband, as Garcia was intruding into Raquel Buenrostro's personal life, and that evidence of their improprieties, including those in the workplace, even if illegally obtained, could find its way to the

26

Police Department for investigation as it did here.

25.   The totality of the circumstances dictate that Garcia can claim no legitimate expectation of privacy. A search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). Accordingly, there is no constitutionally protected search and the Fourth Amendment claim should be dismissed.

### 2.        No Fourth Amendment Seizure.

26.   In the event the Court finds a reasonable expectation of privacy, the Court should nevertheless dismiss Garcia's claims because "[t]he Fourth Amendment does not protect against searches conducted by private individuals acting in a private capacity." *United States v. Oliver*, No. 09-10133, 2011 U.S. App. LEXIS 289 at *12, 2011 WL 38035, at *12 (5th Cir. Jan. 6, 2011)(quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984; *United States v. Runyan*, 275 F.3d 449, 457 (5th Cir. 2001). "Rather, it proscribes only governmental action and is 'wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official.' '" *Oliver*, *Id.*,(quoting *Jacobsen*, 466 U.S. at 113-14).

27.   For a private party search to be classified as government action, (1) the government must know of or acquiesce in the intrusive conduct, and (2) the private party must intend to assist law enforcement in conducting the search. *United States v. Paige*, 136 F.3d 1012, 1017 (5th Cir. 1998). The Plaintiff has not pled any facts showing that Raquel Buenrostro was acting as an agent of the City when she went into the Substation. Plaintiff's pleading indicate that Raquel Buenrostro's entry into the substation was without the consent of the City of Laredo. [Amended pleading at ¶ 64a.]. The

summary judgment evidence shows that none of the elements listed in *Paige* are present here.

28.   The Defendants had no prior knowledge or involvement in the acquisition of the cell phone by Raquel Buenrostro. Raquel Buenrostro's surreptitious venture on the break in of the police Substation was unaided in any shape or form by the Defendants or anyone connected with them. Raquel Buenrostro was not acting in the capacity of a government agent. Her actions were motivated purely by a personal goal: to find out whether her husband was unfaithful to her. The undisputed facts preclude any finding that the Defendants offered any form of compensation to Raquel Buenrostro for her actions or that the Defendants planted the idea that Raquel Buenrostro could conduct a search of the Substation, or that the Defendants lacked specific knowledge that Raquel Buenrostro intended a search of the premises. *See* e.g., *United States v. Bazan*, 807 F.2d 1200, 1204 (5th Cir.1986). Raquel Buenrostro's independent conduct did not implicate a Fourth Amendment.

29.   It is undisputed that, before meeting with the Defendants, Raquel Buenrostro examined the contents of the cell phone, including all text messages and images of Garcia and Gilbert Buenrostro and documented them in a note pad that she handed to Magaña. [*See* Plaintiff's MSJ at p.7-10, 13; "Exhibit I" to Plaintiff's MSJ at pp. 31-32; Magaña's affidavit attached to Defendants' MSJ] Accordingly, the subsequent search by Magaña and Moncivais did not constitute an unlawful search for purposes of the Fourth Amendment. The search was not unlawful for purposes of the Fourth Amendment because it did not exceed the scope of Raquel Buenrostro's private search. *Oliver* 2011 U.S. App. LEXIS 289 *13.

30.   Garcia also complains of Defendants' use of the evidence that Raquel Buenrostro illegally obtained by breaking in into the police substation. The Fourth Amendment does not require the suppression of evidence taken illegally by private citizens. *Burdeau v. McDowell*, 256 U.S. 465, 475,

65 L. Ed. 1048, 41 S. Ct. 574 (1921); *United States v. McDaniel*, 574 F.2d 1224,  (5th Cir. Ga. 1978)(no search warrant required when third party voluntarily releases to the government incriminating evidence), citing *United States v. Blanton*, 479 F.2d 327, 328 (5th Cir. 1973); *Bell v. Redflex Traffic Sys.*, 2009 U.S. Dist. LEXIS 85263 (E.D. Tex. Mar. 25, 2009)(the constitutional protection on an expectation of privacy applies only to invasions by the government); *United States v. Jackson*, 578 F.2d 1162 (5th Cir. Ga. 1978)(copies of business records that were stolen by a divorced ex-spouse and turned over to the Internal Revenue Service were admissible). Garcia's claim that Defendants could not use the evidence obtained from the cell phone to terminate her employment is without merit.

### 2.    The "Special Needs" of the Workplace Exception to the Warrant Requirement Justified the Search

31.    Alternatively, Defendants are not liable to Garcia because although as a general matter, warrantless searches are per se unreasonable under the Fourth Amendment, there is a  specifically established and well-delineated exception to that general rule. The Supreme Court has held that the "'special needs'" of the workplace justify one such exception.  The Supreme Court recently reemphasized that the "'special needs'" of the workplace" constitute an exception to the general rule that warrantless searches "'are per se unreasonable under the Fourth Amendment'. . ." *Ontario v. Quon*, 130 S. Ct. 2619, 2630, 177 L. Ed. 2d 216 (2010) (citation and internal quotations omitted). Under the approach adopted in *Quon*, a government employer's warrantless search for the investigation of work-related misconduct, is reasonable if it is justified at its inception and if the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the circumstances giving rise to the search. *Id.*  The search here satisfied that standard and

was reasonable under that approach.

32.   Here, the search was justified in its inception because Raquel Buenrostro made a complaint that her husband had engaged in a sexual relationship with another employee while on duty.  After Raquel Buenrostro produced the images from the cell phone, which lent credibility to her complaint, the Police Department was justified in initiating an investigation into whether the conduct of Gilbert Buenrostro and Garcia violated rules and regulations. *See* "Exhibit F" which is true a correct copy of the investigation report.  The Police Department has a legitimate, work-related interest in insuring that its police officers, who are entrusted with maintaining law and order by enforcing the laws and ordinance and detecting and suppressing crime, do so during the time assigned to them. It does little to public trust that police officers are engaging in sexual activities while on duty and with another employee whose main duty was to provide support to police officers on the street.

33.   The scope of the search was reasonable for several reasons. As discussed above, Garcia's privacy expectation had been frustrated by Raquel Buenrostro obtaining the cell phone and reviewing its contents. Thus, her interest in the investigation not being excessively intrusive was not reasonable. In addition, the scope of the search could not be limited to investigating only Garcia's work-related conduct because as the testimony showed, all images depicting Gilbert Buenrostro showed that he was in uniform. The video indicated that Gilbert Buenrostro's police radio was active when he was engaged in sex. To determine the time, scope and place where this activity was taking place, it was reasonable to examine each photo to determine its probative value, if any.  To what extent Garcia was willing to engage in this activity knowing that Gilbert Buenrostro was on duty was also a reasonable scope of the investigation. There was no other efficient and expedient way to make that determination than by accessing the images.

IV

**ARTICLE I §§ 9 & 19 OF THE CONSTITUTION OF THE STATE OF TEXAS.**

34.   Lastly, Garcia also moves for summary judgment on the ground that the Defendants' conduct violated Article I §§ 9 & 19 of the Constitution of the State of Texas.  The Plaintiff seeks economic damages as a result of the alleged deprivations. [Amended Complaint at ¶ 212]. Garcia did not state the basis on which she entitled to relief under the Texas Constitution. Therefore, she has waived that summary judgment ground. *Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, 542 F. Supp. 2d 653, 659 (S.D. Tex. 2008).

35.   Alternatively, Garcia is not entitled to relief under the Texas Constitution and summary judgment should be denied. Article I, sec. 19 of the Texas Constitution reads: "No citizen of this state shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of law of the land." It is "the traditional due process guarantee." *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983). Article I, sec. 9 of the same Constitution reads: "The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."

36.   The Texas Supreme Court has held that there is no implied private right of action for damages under the Texas Constitution. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 146-50 (Tex. 1995). Texas appellate courts have interpreted *Bouillion* to bar an implied private right of action for damages under Article I, Sections 9 and 19 of the Texas Constitution. *See, e.g., City of Harlingen v. Obra Homes, Inc.*, No. 13-02-268-CV, 2005 Tex. App. LEXIS 256, 2005 WL74121, at *9 (Tex.

31

App.--Corpus Christi Jan. 13, 2005, no pet. hist.) ("Article one, section 19 of the Texas Constitution creates no private right of action."); *Harrison v. Tex. Dep't of Criminal Justice-Institutional Div.*, 915 S.W.2d 882, 888 (Tex. App.--Houston [1st Dist.] 1995, no writ hist.) (finding no implied private right of action for money damages under Article I, Section 19 of Texas Constitution); *Jackson v. Houston Indep. Sch. Dist.*, 994 S.W.2d 396, 400 (Tex. App.--Houston [14th Dist.] 1999, no pet. hist.) (finding retired principal's claim for back pay was a claim for monetary damages, and thus was not recoverable under Article I, Section 19 of the Texas Constitution); *see* also *O'Bryant v. City of Midland*, 949 S.W.2d 406, 413-14 (Tex. App.--Austin 1997) (applying *Bouillon* to due process claim brought under Texas Constitution), rev'd in part on other grounds, 18 S.W.3d 209 (Tex. 2000); *O'Bryant v. City of Midland*, 949 S.W.2d 406, 413 (Tex. App. -- Austin 1997), aff'd in part and rev'd in part on other grounds, 18 S.W.3d 209 (Tex. 2000); *Univ. of Texas Sys. v. Courtney*, 946 S.W.2d 464, 468 (Tex. App. -- Fort Worth 1997, writ denied); *see* also *Vincent v. W. Texas State Univ.*, 895 S.W.2d 469, 475 (Tex. App. -- Amarillo 1995, no writ); *Maricle v. Biggerstaff*, 10 F. Supp. 2d 705, 708 (N.D. Tex. 1998)(no implied private right of action for money damages under Article I, Section 9 of Texas Constitution); *City of Arlington v. Randall*, 301 S.W.3d 896, 906 (Tex. App. Fort Worth 2009)(no implied cause of action under Article I, Section 9 of Texas Constitution).

37.   Although Garcia has no implied cause of action under the Texas Constitution, she may have an implied cause of action for equitable relief in the form of injunctive relief, which she has pled. *See Bouillion* at 149. The claim for equitable relief on the basis of an unlawful search and seizure of the cell phone under Article I, Section 9 of Texas Constitution should also be dismissed for the same reasons the same claims under the Fourth Amendment should be dismissed. [*See* Section III above].

38.     Article I, Sec. 9 and the Fourth Amendment claims are the same in all material aspects. *Williams v. Kaufman County*, 352 F.3d 994, 1017 (5th Cir. 2003)(noting that Texas courts have interpreted Art. I, section 9 as being congruent with the Fourth Amendment); *Bollig v. State*, 2010 Tex. App. LEXIS 8038, 6-8 (Tex. App. Dallas Oct. 4, 2010)(applying *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) to a claim under Art. I, section 9); *Parker v. State*, 182 S.W.3d 923, 926-927 (Tex. Crim. App. 2006)(analyzing the "reasonable expectation of privacy" under federal law as applicable to an Art. I, section 9 claim.); *Johnson v. State*, 2006 Tex. App. LEXIS 5847, 8-9 (Tex. App. Austin July 7, 2006)( applying *O'Connor v. Ortega*, 480 U.S. 709, 718, 94 L. Ed. 2d 714, 107 S. Ct. 1492 (1987), to a claim under Art. I, section 9 involving a search by a private party). Accordingly, the claims under Art. 1, section 9 of the Texas Constitution should also be dismissed.

39.     The Art. I, section 19 (due process) claim should be dismissed for failure to state a cause of action. The Plaintiff has failed to plead any facts that would support a due process claim under the section 19 distinct from the Art. I, sec. 9 claim, e.g., deprivation of property. The Plaintiff claims that the cell phone was seized and has not been returned to her. But she also claims that the reason it has not been returned is the pending administrative complaint against her and Gilbert Buenrostro, which has been appealed, and is pending before the Fourth Court of Appeals in San Antonio, Texas. [Amended Complaint at ¶¶ 111, 138, and 167]. There are no pleadings to support an unlawful conduct regarding the cell phone separate and apart from the federal claims.

40.     Garcia also seeks reinstatement as a form of equitable relief from her termination. The Plaintiff has failed to state any facts that would support that she had a vested property interest in her employment. *Bexar County Sheriff's Civil Serv. Com v. Davis*, 1991 Tex. LEXIS 163, 34 Tex. Sup.

33

Ct. J. 340 (Tex. 1991) 1991 Tex. LEXIS 163 (Tex. 1991)(An analysis of a procedural due process claim requires a two-part inquiry: whether the party was deprived of a protected property interest and, if so, what process was due to safeguard that interest.)

41.   Garcia  has no viable claims under the Texas Constitution. Defendants respectfully request that the court deny the motion for summary judgment.

42.   In connection with the partial motion for summary judgment requested, Garcia asks this Court to exercise its powers in equity ordering Garcia's Reinstatement to her former position with Defendant City and an award of back pay including lost emoluments of her former employment. Because Garcia is not entitled to the relief requested, the Court should also deny all equitable relief.

Wherefore, Defendants pray that the Court deny the Plaintiff's motion for summary judgment and that Defendants be awarded all such other relief to which they may be justly entitled.

Respectfully submitted,

LAW OFFICES OF ALBERT LÓPEZ
14310 Northbrook Dr., Suite 110
San Antonio, Texas 78232
Telephone:  (210) 404-1983
Fax:  (210) 404-1990

By: /s/ Albert López
    ALBERT LÓPEZ*
    State Bar No. 12562350
    Fed. Id. No. 13339
    alopezoffice@gmail.com
   ATTORNEYS FOR DEFENDANT
* Attorney in Charge

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

MURRAY E. MALAKOFF
Texas Bar No. 12853700
1715 Urbahn, Suite B
Laredo, Texas 78043.

/s/ Albert López
Albert López